# EXHIBIT A

Scale LLP
44 Montgomery St, Floor 3
San Francisco, CA 94104
www.scale.legal

**Adam M. Forest | Managing Partner**
(415) 735-5933 | adam@scale.legal

December 6, 2018

*By Electronic Mail*

Robyn Barrett
Managing Member
FSW Funding
robyn@fswfunding.com

**Re: FSW Funding's Breach of Contract And Misappropriation Of Intellectual Property**

Dear Ms. Barrett:

My firm represents Finvoice, Inc. ("Finvoice"), and I write regarding FSW Funding's breach of contract and misappropriation of Finvoice's intellectual property. It has come to our attention that FSW Funding ("FSW") became a Finvoice customer while building a competing software business, and without disclosing that material information to Finvoice until after FSW had gained access to—and unlawfully used—Finvoice's proprietary information and intellectual property. FSW's conduct creates liability for breach of contract, copyright infringement, misappropriation of trade secrets, misappropriation of confidential information, and unfair competition. You must cease and desist immediately.

In California, a defendant is liable for breach of contract where (1) there is a contractual obligation; (2) the defendant breached that obligation; (3) the plaintiff performed its material obligations; and (4) the breach harmed the plaintiff. *Richman v. Hartley*, 224 Cal.App.4th 1182, 1186 (2014). Here, two contracts ground Finvoice's claims: the SaaS Service Agreement (the "Service Agreement") and the Non-Disclosure Agreement (the "NDA") FSW signed. Both are attached to this letter. In pertinent part, paragraph 2.1 of the Service Agreement prevents FSW from attempting to duplicate Finvoice's software:

> Customer will not, directly or indirectly: reverse engineer, decompile, disassemble or otherwise attempt to discover the source code, object code or underlying structure, ideas, knowhow or algorithms relevant to the Services or any software, documentation or data related to the Services ("Software"); modify, translate, or create derivative works based on the Services or any Software[.]

It continues, in section 3.1, to prohibit FSW from using the information it obtained from Finvoice for any purpose other than use of the Services. Similarly, the NDA prohibits FSW from using Confidential Information "for any purpose other than the Potential Transaction," and broadly defines Confidential Information as "all information (either oral, written, or digital) provided to the Receiving Party by the Disclosing Party, including but not limited to: (a) any document, data, materials, trade secret, process, know-how, technique, design, drawing, diagram, program, source code, invention, and/or work in process; (b) any financial, supplier,

Scale LLP
Adam M. Forest | Managing Partner
(415) 735-5933 | adam@scale.legal

administrative, technical, customer, employee, investor or business information; [or] (c) the Potential Transaction and any information or materials relating to the Potential Transaction[.]"

As a Finvoice customer, and through Finvoice's onboarding process, FSW gained access to Finvoice's nonpublic and proprietary software functionality, design, general business strategy, industry know-how, and company trade secrets. Finvoice has a specific and complex software solution to the many problems posed by asset-backed lending in general, and the "factoring" and "reverse-factoring" industry in particular. As you admitted in a recent meeting with Finvoice CEO, Andrew Bertolina, FSW was developing software competitive to Finvoice when it posed as a potential customer, went through Finvoice's onboarding process, and then abruptly ended its contract, all while failing to disclose the competitive nature of its relationship. We are privy to written correspondence wherein FSW concedes that its termination of the Service Agreement was not based on the quality of Finvoice's product; which begs the question: why terminate? Given the circumstances, and particularly given FSW's almost immediate termination of the Services Agreement after completing onboarding and before significant delivery of the services, a finder of fact could infer an ulterior, unlawful motive: to shortcut FSW's path to a competing service. Taking that shortcut not only flies in the face of basic fairness and industry norms of competition, but it also constitutes a breach of the Services Agreement and NDA.

It also constitutes copyright infringement under 17 U.S.C. section 106 and 501. A defendant is liable for copyright infringement where (1) the plaintiff has ownership of a valid copyright and (2) the defendant commits actionable copying of original, constituent elements of the work. *Id*. "Actionable copying" occurs where (a) the defendant has access to the plaintiff's work and (b) there are probative similarities between the works of both parties. *Id*. FSW had access to Finvoice's software application and, as various customers and industry companies have informed us, has built a software application with substantially similar characteristics. FSW's reluctance to share any relevant information only confirms Finvoice's reasonable suspicion of copyright infringement.

FSW's actions further constitute a misappropriation of trade secrets under the Uniform Trade Secrets Act, codified as California Civil Code section 3426 (the "UTSA"). A defendant is liable under the UTSA where (1) a trade secret exists, (2) the trade secret is misappropriated, and (3) improper means are used to misappropriate the trade secret. Here, FSW misrepresented itself as a Finvoice customer to induce Finvoice to share trade secrets, with no intent of using the software, for the undisclosed purpose of developing a competing software application. FSW's subsequent use of Finvoice trade secrets to build a competitive product and approach Finvoice customers is a misappropriation under the UTSA.

FSW has also engaged in unfair competition under California Business and Professions Code Section 17200 et seq. (the "UCL"). The UCL makes unlawful business practices that are unlawful, unfair, or fraudulent, and permits injunctive relief to bar future misconduct and disgorge profits to remedy it. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1148 (2003). Finvoice's theory is viable under all three prongs of the UCL: FSW's conduct is unlawful insofar as it constitutes copyright infringement or misappropriation of trade secrets; unfair for the same reasons and also given FSW's breach of contract; and fraudulent because FSW posed as a customer to obtain information helpful to it as a competitor. The UCL permits

## Scale LLP
Adam M. Forest | Managing Partner
(415) 735-5933 | adam@scale.legal

Finvoice to enjoin future like conduct, and to the extent FSW has obtained or will obtain profits from Finvoice's customers, to disgorge them.

Accordingly, we demand that you immediately cease and desist from further using or disclosing Finvoice proprietary information, unfairly competing with Finvoice, and soliciting Finvoice customers. If you do not, or if you do not appropriately respond to this letter within ten (10) business days, Finvoice will commence litigation in San Francisco Superior Court and request a preliminary injunction, damages, lost profits, and attorney fees.

If you dispute any of the above, we invite FSW to provide Finvoice with a demonstration of your software, which FSW has so far refused to provide. That refusal only strengthens Finvoice's claims and confirms its suspicions.

Finally, please take notice that FSW must immediately take steps to preserve documents, data, tangible things and electronically stored information potentially relevant to prospective claims that Finvoice may have against you, and any affirmative defenses you might allege. The failure to preserve, or destruction of, potentially relevant evidence constitutes unlawful spoliation.

We await your response.

Sincerely,

Adam M. Forest, Esq. (SBN 267626)
Managing Partner
Scale LLP

3

**SAAS SERVICES ORDER FORM**

| **Customer:** Factors Southwest LLC (known as FSW Funding) | **Contact:** Robyn Barrett |
|---|---|
| **Address:** 4530 East Shea Boulevard<br>Suite 142<br>Phoenix, AZ 85028 | **Phone:** 602.535.5984<br><br>**E-Mail:** robyn@fswfunding.com |
| **Services**:<br><br>Finvoice to provide to Customer FV Originate and FV Underwrite (the "Services"), subject to the terms contained herein.  The Services are commercial software applications further described below:<br><br>1. FV Originate is an invoice financing software application that enables a factor to engage its customers through accounting software APIs and modern web design.<br><br>2. FV Underwrite is a software application that enables a factor to analyze and underwrite incoming deals through a modern dashboard and workflow tool.<br><br>These services are reflective of a 'SaaS Light' module and will mandate less customization + client service than Finvoice's standard product. ||
| **Services Fees**:<br>**Fixed Fee:** $500 USD per month, payable in advance and subject to the terms of Section 4 herein. ("Early adopter, small factor pricing")<br><br>**Variable Fee:**<br>*FV Originate:* $60 per prospect submission.<br><br>*FV Underwrite / FV Operate:*<br>$10 per Yodlee integration per client monthly.<br><br>$10 per Quickbooks Webhooks per client monthly. Quickbooks Webhooks allows real-time accounting monitoring. | **Initial Service Term**: 12 months. |

1

> **Implementation Services**: Implementation Services will be provided on a fixed-fee basis as indicated in the Statement of Work ("SOW") attached hereto as Exhibit A ("Implementation Services"). Customer requested customization work ("Custom Development") will be billed on a time and materials basis. As applicable, each SOW will contain a detailed estimate of any time and materials necessary to complete the Implementation Services ("T&M Estimate"). Company will make a commercially reasonable effort to provide the Custom Development within the T&M Estimate, up to the number of hours agreed to by the parties. Company will make a reasonable effort to notify Customer as soon as practicable if it appears that the T&M Estimate may be exceeded. Upon receiving such amended T&M Estimate, Customer will assess, and accept or reject the amended T&M Estimate. Unless Customer rejects such amended T&M Estimate within five (5) days of delivery, such amended T&M Estimate shall be deemed accepted by Customer and Customer shall be liable for all Implementation Fees associated with the Implementation Services delivered in reliance on such amended T&M Estimate. Customer shall pay Company the Implementation Fee upon execution of the Agreement.
>
> Implementation Fee (one-time):  $3,500 due upon signing.

## SAAS SERVICES AGREEMENT

This SaaS Services Agreement ("Agreement") is entered into on this 14th day of November, 2017 (the "Effective Date") between Finvoice, Inc. with a registerd place of business at 530 Divisadero #152, San Francisco CA ("Company"), and the Customer listed above ("Customer").  This Agreement includes and incorporates the above Order Form, as well as the attached Terms and Conditions and contains, among other things, warranty disclaimers, liability limitations and use limitations.  There shall be no force or effect to any different terms of any related purchase order or similar form even if signed by the parties after the date hereof.

Governing Law:  California, USA

**Finvoice, Inc.:**                                    **Factors Southwest LLC:**

By: *Andrew Bertolina*    11/14/2017           By: *Robyn Barrett*    11/14/2017
Name: Andrew Bertolina                           Name: Robyn Barrett
Title: Co-Founder and CEO                         Title: FSW Funding

LIBC/3968202.1

Doc ID: fcd6c3099f20c30aaf5ff37b1e52d779ad9a49d2

## TERMS AND CONDITIONS

LIBC/3968202.1

Doc ID: fcd6c3099f20c30aaf5ff37b1e52d779ad9a49d2

# 1. SAAS SERVICES AND SUPPORT

1. Subject to the terms of this Agreement, Company will use commercially reasonable efforts to provide Customer the Services in accordance with the Service Level Terms attached hereto as <u>Exhibit B</u>.

2. Subject to the terms hereof, Company will provide Customer with reasonable technical support services in accordance with the Company's standard practice.

# 2. RESTRICTIONS AND RESPONSIBILITIES

2.1. Customer will not, directly or indirectly: reverse engineer, decompile, disassemble or otherwise attempt to discover the source code, object code or underlying structure, ideas, know-how or algorithms relevant to the Services or any software, documentation or data related to the Services ("Software"); modify, translate, or create derivative works based on the Services or any Software (except to the extent expressly permitted by Company or authorized within the Services); use the Services or any Software for timesharing or service bureau purposes or otherwise for the benefit of a third; or remove any proprietary notices or labels.

2.2. Further, Customer may not remove or export from the United States or allow the export or re-export of the Services, Software or anything related thereto, or any direct product thereof in violation of any restrictions, laws or regulations of the United States Department of Commerce, the United States Department of Treasury Office of Foreign Assets Control, or any other United States or foreign agency or authority. As defined in FAR section 2.101, the Software and documentation are "commercial items" and according to DFAR section 252(a)(1) and (5) are deemed to be "commercial computer software" and "commercial computer software documentation." Consistent with DFAR section 227.7202 and FAR section 12.212, any use modification, reproduction, release, performance, display, or disclosure of such commercial software or commercial software documentation by the U.S. Government will be governed solely by the terms of this Agreement and will be prohibited except to the extent expressly permitted by the terms of this Agreement.

2.3. Customer represents, covenants, and warrants that Customer will use the Services only in compliance with Company's standard published policies then in effect (the "Policy") and all applicable laws and regulations. Customer hereby agrees to indemnify and hold harmless Company against any damages, losses, liabilities, settlements and expenses (including without limitation costs and attorneys' fees) in connection with any claim or action that arises from an alleged violation of the foregoing or otherwise from Customer's use of Services. Although Company has no obligation to monitor Customer's use of the Services, Company may do so and may prohibit any use of the Services it believes may be (or alleged to be) in violation of the foregoing.

2.4. Customer shall be responsible for obtaining and maintaining any equipment and ancillary services needed to connect to, access or otherwise use the Services, including, without limitation, modems, hardware, servers, software, operating systems, networking, web servers and the like (collectively, "Equipment"). Customer shall also be responsible for maintaining the security of the Equipment, Customer account, passwords (including but not limited to administrative and user passwords) and files, and for all uses of Customer account or the Equipment with or without Customer's knowledge or consent.

# 3. CONFIDENTIALITY; PROPRIETARY RIGHTS

3.1. Each party (the "Receiving Party") understands that the other party (the "Disclosing Party") has disclosed or may disclose business, technical or financial information relating to the Disclosing Party's business (hereinafter referred to as "Proprietary Information" of the Disclosing Party). Proprietary Information of Company includes non-public information regarding features, functionality and performance of the Service. Proprietary Information of Customer includes non-public data provided by Customer to Company to enable the provision of the Services ("Customer Data"). The Receiving Party agrees: (i) to take reasonable precautions to protect such Proprietary Information, and (ii) not to use (except in performance of the Services or as otherwise permitted herein) or divulge to any third person any such Proprietary Information. The Disclosing Party agrees that the foregoing shall not apply with respect to any information after five (5) years following the disclosure thereof or any information that the Receiving Party can document (a) is or becomes generally available to the public, or (b) was in its possession or known by it prior to receipt from the Disclosing Party, or (c) was rightfully disclosed to it without restriction by a third party, or (d) was independently developed without use of any Proprietary Information of the Disclosing Party or (e) is required to be disclosed by law.

3.2. Customer shall own all right, title and interest in and to the Customer Data. Company shall own and retain all right, title and interest in and to (a) the Services and Software, all improvements, enhancements or modifications thereto, (b) any software, applications, inventions or other technology developed in connection with Implementation Services or support, and (c) all intellectual property rights related to any of the foregoing.

3.3. Notwithstanding anything to the contrary, Company shall have the right to collect and analyze data and other information relating to the provision, use and performance of various aspects of the Services and related systems and technologies (including, without limitation, information concerning Customer Data and data derived therefrom), and Company will be free (during and after the term hereof) to (i) use such information and data to improve and enhance the Services and for other development, diagnostic and corrective purposes in connection with the Services and other Company offerings, and (ii) disclose such data solely in aggregate or other de-identified form in connection with its business. No rights or licenses are granted except as expressly set forth herein.

**4. PAYMENT OF FEES**

4.1. Customer shall pay Company the then applicable fees described in the Order Form for the Services and Implementation Services in accordance with the terms therein (the "Fees").

4.2. Company reserves the right to change the Fees or applicable charges and to institute new charges and Fees at the end of the Initial Service Term or then current renewal term, with thirty (30) days prior notice to Customer (which may be sent by email). If Customer believes that Company has billed Customer incorrectly, Customer must contact Company no later than 60 days after the closing date on the first billing statement in which the error or problem appeared, in order to receive an adjustment or credit. Inquiries should be directed to Company's customer support department.

4.3. Default method of payment is first of month, however, Company may choose to bill through an invoice, in which case, full payment for invoices issued in any given month must be received by Company thirty (30) days after the mailing date of the invoice. Unpaid amounts are subject to a finance charge of 1.5% per month on any outstanding balance, or the maximum permitted by law, whichever is lower, plus all expenses of collection and may result in immediate termination of Service. Customer shall be responsible for all taxes associated with Services other than U.S. taxes based on Company's net income.

### 5. TERM AND TERMINATION

5.1. Subject to earlier termination as provided below, this Agreement is for the Initial Service Term as specified in the Order Form, and shall be automatically renewed for additional periods of the same duration as the Initial Service Term (collectively, the "Term"), unless either party requests termination at least thirty (30) days prior to the end of the then-current term.

5.2. In addition to any other remedies it may have, either party may also terminate this Agreement upon thirty (30) days' notice (or without notice in the case of nonpayment), if the other party materially breaches any of the terms or conditions of this Agreement. Customer will pay in full for the Services up to and including the last day on which the Services are provided. Upon any termination, Company will make all Customer Data available to Customer for electronic retrieval for a period of thirty (30) days, but thereafter Company may, but is not obligated to, delete stored Customer Data. All sections of this Agreement which by their nature should survive termination will survive termination, including, without limitation, accrued rights to payment, confidentiality obligations, warranty disclaimers, and limitations of liability.

### 6. WARRANTY AND DISCLAIMER

Company shall use reasonable efforts consistent with prevailing industry standards to maintain the Services in a manner which minimizes errors and interruptions in the Services and shall perform the Implementation Services in a professional and workmanlike manner. Services may be temporarily unavailable for scheduled maintenance or for unscheduled emergency maintenance, either by Company or by third-party providers, or because of other causes beyond Company's reasonable control, but Company shall use reasonable efforts to provide advance notice in writing or by e-mail of any scheduled service disruption. HOWEVER, COMPANY DOES NOT WARRANT THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE; NOR DOES IT MAKE ANY WARRANTY AS TO THE RESULTS THAT MAY BE OBTAINED FROM USE OF THE SERVICES. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION, THE SERVICES AND IMPLEMENTATION SERVICES ARE PROVIDED "AS IS" AND COMPANY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.

### 7. INDEMNITY

Company shall hold Customer harmless from liability to third parties resulting from infringement by the Service of any United States patent or any copyright or misappropriation of any trade secret, provided Company is promptly notified of any and all threats, claims and proceedings related thereto and given reasonable assistance and the opportunity to assume sole control over defense and settlement; Company will not be responsible for any settlement it does not approve in writing. The foregoing obligations do not apply with respect to portions or components of the Service (i) not supplied by Company, (ii) made in whole or in part in accordance with Customer specifications, (iii) that are modified after delivery by Company, (iv) combined with other products, processes or materials where the alleged infringement relates to such combination, (v) where Customer continues allegedly infringing activity after being notified thereof or after being informed of modifications that would have avoided the alleged infringement, or (vi) where Customer's use of the Service is not strictly in accordance with this Agreement. If, due to a claim of infringement, the Services are held by a court of competent jurisdiction to be or are believed by Company to be infringing, Company may, at its option and expense (a) replace or modify the Service to be non-infringing provided that such modification or replacement contains substantially similar features and functionality, (b) obtain for Customer a license to continue using the Service, or (c) if neither of the foregoing is commercially practicable, terminate this Agreement and Customer's rights hereunder and provide Customer a refund of any prepaid, unused fees for the Service.

### 8. LIMITATION OF LIABILITY

NOTWITHSTANDING ANYTHING TO THE CONTRARY, EXCEPT FOR BODILY INJURY OF A PERSON, COMPANY AND ITS SUPPLIERS (INCLUDING BUT NOT LIMITED TO ALL EQUIPMENT AND TECHNOLOGY SUPPLIERS), OFFICERS, AFFILIATES, REPRESENTATIVES, CONTRACTORS AND EMPLOYEES SHALL NOT BE RESPONSIBLE OR LIABLE WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR TERMS AND CONDITIONS RELATED THERETO UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY: (A) FOR ERROR OR INTERRUPTION OF USE OR FOR LOSS OR INACCURACY OR CORRUPTION OF DATA OR COST OF PROCUREMENT OF SUBSTITUTE GOODS, SERVICES OR TECHNOLOGY OR LOSS OF BUSINESS; (B) FOR ANY INDIRECT, EXEMPLARY, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES; (C) FOR ANY MATTER BEYOND COMPANY'S REASONABLE CONTROL; OR (D) FOR ANY AMOUNTS THAT, TOGETHER WITH AMOUNTS ASSOCIATED WITH ALL OTHER CLAIMS, EXCEED THE FEES PAID BY CUSTOMER TO COMPANY FOR THE SERVICES UNDER THIS AGREEMENT IN THE 12

MONTHS PRIOR TO THE ACT THAT GAVE RISE TO THE LIABILITY, IN EACH CASE, WHETHER OR NOT COMPANY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

### 9. MISCELLANEOUS

If any provision of this Agreement is found to be unenforceable or invalid, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement will otherwise remain in full force and effect and enforceable.  This Agreement is not assignable, transferable or sublicensable by Customer except with Company's prior written consent.  Company may transfer and assign any of its rights and obligations under this Agreement without consent.  This Agreement is the complete and exclusive statement of the mutual understanding of the parties and supersedes and cancels all previous written and oral agreements, communications and other understandings relating to the subject matter of this Agreement, and that all waivers and modifications must be in a writing signed by both parties, except as otherwise provided herein.  No agency, partnership, joint venture, or employment is created as a result of this Agreement and Customer does not have any authority of any kind to bind Company in any respect whatsoever.  In any action or proceeding to enforce rights under this Agreement, the prevailing party will be entitled to recover costs and attorneys' fees. All notices under this Agreement will be in writing and will be deemed to have been duly given when received, if personally delivered; when receipt is electronically confirmed, if transmitted by facsimile or e-mail; the day after it is sent, if sent for next day delivery by recognized overnight delivery service; and upon receipt, if sent by certified or registered mail, return receipt requested.  This Agreement shall be governed by the laws of the State of California without regard to its conflict of laws provisions.

The parties shall work together in good faith to issue at least one mutually agreed upon press release within 90 days of the Effective Date, and Customer otherwise agrees to reasonably cooperate with Company to serve as a reference account upon request.

## EXHIBIT A

### Statement of Work – *Implementation services*

**Project Scope**

The Company shall provide services, resources, and tools to support a successful implementation of the SaaS offering FV Originate and FV Underwrite (the "Service(s)"). The anticipated implementation date for the Services is 1 month from signing.

The scope of the project will include the following:

- Customer Branding (logo and text).

FV Originate:

- Sign Up, Sign In and Sign Out functionality for borrowers (Authentication Module).

- Accounting Software Integrations. The Accounting Software Provider is solely responsible for any problems arising with the integration.
    - The QuickBooks Accounting Software Integration.
    - The SageOne Accounting Software Integration.
    - The Xero Accounting Software Integration.

- Manual Factoring Flow for individual invoices for Borrowers who do not have / wish to integrate their accounting software.

FV Underwrite:

- E-document signing. Customer is able to execute contracts in real-time through electronic signatures.

- Verification. Customer can verify borrower through a verification methods including: video, email and other automated verification methods.

- Yodlee Integration. Yodlee is solely responsible for any problems arising with the integration.

- Log In functionality for the Customer's employees.

- Dashboard listing Borrower submissions chronologically with search functionality.

- Borrower Profile with individual Submission summaries with functionality to download invoices and supporting documents and information.

**Key Objectives**

Key objectives of Customer in implementing SaaS offering include:
- Reducing the time it takes for their customers to apply for invoice financing down to minutes.

LIBC/3968202.1

- Convert leads from digital marketing channels and streamline application / underwriting processes.
- Realize more conversions as a result of an easy to use process for their borrowers.
- Optimize due diligence through an easy to use dashboard.
- Reduce the time taken to underwrite by securely viewing and accessing borrower profiles and submissions.

**Project Deliverables**

**Full Implementation Guide:**
Further Documentation and Training will be provided for SaaS offering and data delivery methods in the forthcoming Full Implementation Guide.

**White Label Solution with Customer Branding:**
FV Originate and FV Underwrite will contain Customer's logo, chosen text and links back to Customer's website.

Included in your Implementation Services Fee is an allocation of 20 engineering hours for configuration of the Services. Customer's requested configurations will be scoped in good faith. Requested configurations beyond 20 engineering hours will be treated as custom engineering work.*1*

**Custom Subdomain:**
FV Originate will be hosted at fswfunding.finvoice.co.
FV Underwrite will be hosted at admin.fswfunding.finvoice.co.

**Data Delivery through one of 2 methods (in addition to FV Underwrite):**

1. Finvoice API - the ability to access data collected by the white label solution through Customer directly building into our API.

2. Email - the ability to access data collected by the white label solution instantly in your inbox.

**Security Implementation:**

- Secure Hosting through Amazon Web Services.
- Secure Data: Data is only accessible through valid tokens.
- Secure Data Separation and Delivery: System is secured for multi-tenancy that ensures complete data separation.

**System Performance (Load / Stress) Testing:**
Provide Customer results of testing showing the SaaS offering can scale to meet the anticipated volume of Customer Transactions / Data.

**Final Acceptance Testing:**
Provide Customer the ability to test the system as a whole for 5 days to ensure it meets specifications as outlined in the Statement of Work.

**Support, Maintenance and Customer Success Plan:**
A description of the roles, responsibilities, problem escalations path, scheduled downtimes, contact names, emails, and phone numbers in support of the SaaS offering after signing.

**Work Order Terms and Conditions**

LIBC/3968202.1

The Customer hereby orders and the Company agrees to provide the services and deliverables described in this Work Order. The services and deliverables are provided pursuant to the terms and conditions of this Work Order and the Contract between the Company and Customer. Payment for services and deliverables will be made based on the successful completion of the Deliverables as defined by this Statement Of Work. Successful delivery of the work will be mutually agreed upon by the Company and Customer.

| Deliverable Name | Acceptance Date |
| --- | --- |
| Full Implementation Guide | Immediate |
| White Label Originate Solution with Customer Branding | 1 week after receiving filled implementation questionnaire |
| Custom Subdomain | TBD |
| Data Delivery through one of 2 methods:<br>• API<br>• Email | TBD |
| White Label Underwrite Dashboard | TBD |
| Security Implementation | TBD |
| System Performance (Load / Stress) Testing | TBD |
| Final Acceptance Testing (Start of 5 Day Period) | 1 week before go-live |
| Support, Maintenance & Customer Success Plan | 2 weeks before go-live |

[1]In the cases where Custom Engineering is required, a SOW will contain a detailed estimate of the time and materials necessary for provision of these Services. Provision of these Consulting Services are mutually agreed upon. These services will be billed at $150.00 an hour ("T&M Estimate").

LIBC/3968202.1

## **EXHIBIT B**

**Service Level Terms**

Finvoice will expend commercially reasonable efforts to meet and/or exceed the following operational performance metrics:

- 99% system uptime per month (Scheduled and Emergency Maintenance excluded).

- Scheduled Maintenance and Downtime.

- Finvoice shall provide Company with at least 48 hours prior notice of any Scheduled Maintenance.

- Scheduled Maintenance, in most cases, shall not exceed four (4) hours downtime in a particular instance and 16 hours in aggregate in any given month.

- Standard Scheduled maintenance windows are Saturdays from 10:00 pm to 2:00 am PT (1am-5am ET)

- On occasion, Emergency Maintenance may be required. Emergency Maintenance may include, but is not limited to security related issues and/or technical problems that could impact the availability of the Service. In such cases, Finvoice will notify Company prior to downtime as time permits.



Finvoice, Inc.
530 Divisadero Street, #152, San Francisco, CA 94117, USA
**Tel** 310-951-0596  **Email** andrew@getfinvoice.com

| INVOICE FSW00001 | 11.14.2017 |
|---|---:|

| BILL TO | INSTRUCTIONS |
|---|---|
| Factors Southwest LLC (known as FSW Funding) <br> ATTN: Robyn Barrett <br> 4530 East Shea Boulevard <br> Suite 142 <br> Phoenix, AZ 85028 | *WIRE  PAYMENTS:* <br> Bank*: First Republic Bank* <br> Bank Address*: 1 Embarcadero Center, San Francisco, CA  94111* <br> Account Number*: 80002028042* <br> ABA Routing Number*: 321081669* <br> SWIFT CODE*: FRBBUS6S* <br><br> Beneficiar*y: Finvoice, Inc.* <br> Bank Address*:* <br> *First Republic Bank* <br> *1 Embarcadero Center* <br> *Ste SL 2* <br> *San Francisco, CA 94111* <br> *Attn: Lynn Nguy* |

| ACTIVITY | Description | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| Implementation Fee | Implementation Services for FV Originate & FV Underwrite | 1 | $3,500 | $3,500 |

|  | SUBTOTAL | $3,500 |
|---|---|---:|
|  | TOTAL | $3,500 |

Thank you

Doc ID: fcd6c3099f20c30aaf5ff37b1e52d779ad9a49d2



# Audit Trail

| | |
|---|---|
| **TITLE** | Finvoice <> FSW Agreement |
| **FILE NAME** | 2017-11-14 ....5k NRR.pdf and 1 other |
| **DOCUMENT ID** | fcd6c3099f20c30aaf5ff37b1e52d779ad9a49d2 |
| **STATUS** | ● Completed |

## Document History

**SENT** — **11/15/2017** 01:00:35 UTC
Sent for signature to Andrew Bertolina (contracts@finvoice.co) and Robyn Barrett (robyn@fswfunding.com)
IP: 73.15.23.134

**VIEWED** — **11/15/2017** 01:00:47 UTC
Viewed by Andrew Bertolina (contracts@finvoice.co)
IP: 73.15.23.134

**SIGNED** — **11/15/2017** 01:01:13 UTC
Signed by Andrew Bertolina (contracts@finvoice.co)
IP: 73.15.23.134

**VIEWED** — **11/15/2017** 01:13:02 UTC
Viewed by Robyn Barrett (robyn@fswfunding.com)
IP: 161.47.126.81

**SIGNED** — **11/15/2017** 01:13:27 UTC
Signed by Robyn Barrett (robyn@fswfunding.com)
IP: 161.47.126.81

**COMPLETED** — **11/15/2017** 01:13:27 UTC
The document has been completed.

**MUTUAL NONDISCLOSURE AGREEMENT**

This **MUTUAL NONDISCLOSURE AGREEMENT** (the "**Agreement**") is entered into as of _____ (the "**Effective Date**") by and between Finvoice, Inc., a Delaware corporation ("**Finvoice**"), located at 1225 Fulton Street, San Francisco, CA 94117, and _FACTORS SOUTHWEST LLC_____, a _AZ LLC_____ _____ ("**Company**" and together with Finvoice, each a "**Party**" and collectively, the "**Parties**"), located at _4530 E Shea Blvd, Ste 142, Phoenix AZ 85028_____.

WHEREAS, each Party wishes to disclose and to receive from the other Party certain Confidential Information (as defined below) for the sole purpose(s) of engaging in a potential business transaction (the "**Potential Transaction**"); and

WHEREAS, the parties wish to protect the Confidential Information which may be disclosed between them.

NOW, THEREFORE, in consideration of access to the Confidential Information and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties agree as follows:

1. A Party disclosing Confidential Information shall herein be referred to as the "**Disclosing Party**", and a Party receiving Confidential Information shall herein be referred to as the "**Receiving Party**". For the purposes of this Agreement, "**Confidential Information**" means all information (either oral, written, or digital) provided to the Receiving Party by the Disclosing Party, including but not limited to: (a) any document, data, materials, trade secret, process, know-how, technique, design, drawing, diagram, program, source code, invention, and/or work in process; (b) any financial, supplier, administrative, technical, customer, employee, investor or business information; (c) the Potential Transaction and any information or materials relating to the Potential Transaction; and (d) any information or materials which the Disclosing Party and/or its subsidiaries or affiliates are required to keep confidential pursuant to an agreement with a third party.

2. The Receiving Party agrees to treat the Confidential Information as strictly confidential and shall not, directly or indirectly: (a) use the Confidential Information for any purpose other than the Potential Transaction, internal reporting or de-identified analytics; (b) copy or modify the Confidential Information without the prior written consent of the Disclosing Party; or (c) distribute or disclose the Confidential Information to any third party other than to the Receiving Party's employees, directors, agents, independent contractors and potential investors (collectively, "**Third Party Recipients**") who have a specific need to know the Confidential Information and who are obligated to maintain the Confidential Information in confidence to at least the same extent as the Receiving Party is obligated under this Agreement. The Receiving Party agrees, at its sole expense, to take all reasonable measures to prevent its Third Party Recipients from breaching this Agreement and the Receiving Party agrees that it shall be responsible for any breach or threatened breach of this Agreement by any of its Third Party Recipients. The Receiving Party agrees not to sell, transfer, lease, or license the Confidential Information of the Disclosing Party in any manner whatsoever.

3. The Receiving Party agrees to notify the Disclosing Party promptly in writing of any breach or threatened breach of this Agreement, such notice to include a detailed description of the circumstances of the breach or threatened breach and the parties involved. The Receiving Party agrees to provide reasonable assistance to the Disclosing Party in the prosecution of any parties who are in violation of this Agreement.

4. The Receiving Party shall not be required to keep confidential any Confidential Information that the Receiving Party can demonstrate by written documentation: (a) is or has entered the public domain through no fault of the Receiving Party or its Third Party Recipients; (b) is or was independently developed by or for the Receiving Party without use, directly or indirectly, of the Confidential Information; (c) is or was received by the Receiving Party in good faith from a third party on a non-confidential basis, provided that the source of such Confidential Information was not bound by an obligation of confidentiality with respect to such information; or (d) is approved for release by the prior written authorization of the Disclosing Party.

5. In the event that the Receiving Party or any of its Third Party Recipients receive a request or demand to disclose all or part of the Confidential Information pursuant to a court order, operation of law, subpoena, requirement of a governmental authority, or otherwise, the Receiving Party agrees to: (a) promptly notify the Disclosing Party of the terms and surrounding circumstances of such request or demand so that the Disclosing Party may seek a protective order, or other appropriate relief and/or waive compliance with the provisions of this Agreement; (b) promptly consult with the Disclosing Party on the advisability of taking steps to resist or narrow such request or demand; (c) in the absence of a protective order or other remedy or the receipt of a waiver from the Disclosing Party and only after the Receiving Party's compliance with (a) and (b) above, minimize the disclosure of the Confidential Information ultimately required to be disclosed to only that Confidential Information which is reasonably necessary to meet the express requirements of the request or demand; and (d) subject to the mutual agreement of the parties concerning costs and expenses, cooperate with the Disclosing Party to obtain an order or other reliable assurance that confidential treatment will be accorded to any Confidential Information ultimately required to be disclosed after the Receiving Party's compliance with (a) and (b) above.

6.      Within five (5) calendar days after the Receiving Party's receipt of the Disclosing Party's written request, the Receiving Party shall return to the Disclosing Party all tangible materials containing or embodying the Confidential Information, and/or at the specific request of the Disclosing Party, destroy all documents (paper, electronic or otherwise) containing or embodying the Confidential Information. Notwithstanding the return and destruction of the Confidential Information, the Receiving Party and its Third Party Recipients shall continue to be bound by the terms and conditions of this Agreement. Nothing in this Agreement will prevent the Receiving Party from retaining a copy of the Confidential Information to use solely for audit, regulatory or legal purposes.

7.      The terms and conditions of this Agreement shall apply to Confidential Information disclosed by the Disclosing Party prior to, on and after the Effective Date set forth above, and shall continue for two years from such Effective Date.

8.      The Receiving Party agrees that the breach or threatened breach of any of the terms or conditions of this Agreement will cause the Disclosing Party and/or the owner of such Confidential Information irreparable injury for which the recovery of money damages would be inadequate. Therefore, the Disclosing Party or such other party shall be entitled to obtain injunctive relief against the breach or threatened breach of this Agreement, in addition to any other remedies the Disclosing Party may have under applicable law and without the necessity of posting a bond, even if otherwise normally required.

9.      Nothing contained in this Agreement shall be construed as: (a) granting, conferring, or implying any rights to the Receiving Party by license or otherwise; (b) creating any partnership or joint venture between Finvoice and Company; or (c) obligating the parties to enter into a business transaction. Neither Party shall assign its rights or obligations arising under this Agreement, in whole or in part, without the prior written consent of the other Party.

10.     Any notice required or permitted under this Agreement shall be in writing and shall be deemed given (a) if by hand delivery, upon receipt thereof, (b) if mailed, three (3) days after deposit in the United States mails, postage prepaid, certified mail, return receipt requested, and (c) if by next day delivery service, upon such delivery. All notices shall be addressed as follows (or to such other address as either Party may in the future specify in writing to the other):

In the case of Finvoice:                                In the case of the Company:

1225 Fulton Street                                      FACTORS SOUTHWEST LLC
San Francisco, CA 94117                                 4530 E Shea Blvd #142
                                                        Phoenix AZ 85028
Attn: Andrew Bertolina                                  Attn: Robyn Barrett

11.     This Agreement sets forth the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, proposals, understandings and representations, written or oral, between the Parties with respect to the subject matter hereof.

12.     No change, deletion, modification, amendment, supplement to or waiver of this Agreement shall be binding upon any Party unless made in writing and signed by duly authorized representatives of both Parties. No delay or failure by either Party in exercising or enforcing any of its rights or remedies hereunder, in whole or in part, and no course of dealing or performance with respect thereto, shall constitute a waiver thereof in any other instance. All rights and remedies shall be cumulative and not exclusive of any other rights or remedies.

13.     This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of California, without giving effect to its conflict of laws provisions. The exclusive jurisdiction and venue for all legal actions arising out of the Agreement shall be in an appropriate federal or state court sitting in the City of San Francisco, State of California, and the parties hereby consent to the jurisdiction of such courts. Each Party expressly waives any rights it may have to contest the jurisdiction, venue or convenience of any court sitting in the State of California.

14.     In the event that any provision of this Agreement shall for any reason be determined to be void, invalid, illegal or otherwise unenforceable in any respect by any court of competent jurisdiction, then, to the full extent permitted by law: (a) all other provisions hereof will remain in full force and effect and will be liberally construed in order to carry out the intent of the parties hereto as nearly as may be possible; (b) such determination will not affect the remaining provisions of this Agreement; and (c) any court of competent jurisdiction will have the power to reform such provision to the extent necessary for such provision to be enforceable under applicable law.

15.     This Agreement may be executed in counterparts, each such counterpart shall be an original and altogether shall constitute but one and the same document.

    IN WITNESS WHEREOF, the parties hereto by their duly authorized representatives have executed this Agreement in

duplicate.

Finvoice, Inc.

By: _Andrew Bertolina_

Andrew Bertolina

Title: CEO & Co-Founder

Date:  11/7/17

FACTORS SOUTHWEST LLC
By: _D Barrett_

ROBYN BARRETT
Title: managing member
Date: 11/7/17

-3-